**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JEFFERY L. SHAFFER,**

    **Plaintiff,**

  **v.**         **Civil Action 2:18-cv-185**
              **Judge James L. Graham**
              **Magistrate Judge Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

   Plaintiff, Jeffery L. Shaffer, brings this action under 42 U.S.C. § 405(g) seeking review of

a final decision of the Commissioner of Social Security ("Commissioner") denying his application

for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM**

the Commissioner's decision.

## I.  BACKGROUND

   Plaintiff filed his application for DIB on November 17, 2014, alleging that he was disabled

beginning February 6, 2012. (Tr. 139–45, PAGEID #: 175–81). The Administrative Law Judge

(the "ALJ") held the hearing on January 10, 2017 after his application was denied initially and on

reconsideration. (Tr. 25–71, PAGEID #: 61–107). On April 28, 2017, the ALJ issued a decision

denying Plaintiff's application for benefits. (Tr. 10–21, PAGEID #: 46–57). The Appeals Council

denied Plaintiff's request for review, making the ALJ's decision the final decision of the

Commissioner. (Tr. 1–5, PAGEID #: 37–41).

   Plaintiff filed the instant case seeking a review of the Commissioner's decision on

March 2, 2018. (Doc. 1). Plaintiff filed his Statement of Errors on July 23, 2018 (Doc. 11).

Defendant filed an Opposition on September 6, 2018 (Doc. 13), and Plaintiff did not file a Reply. Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

Plaintiff was 49 years old at the time of the hearing. (Tr. 31–32, PAGEID #:67–68). At the hearing, Plaintiff testified mainly about his physical issues; however, because Plaintiff's argument relates only to his mental impairments, the Court focuses on his testimony regarding the same.

Plaintiff testified that he takes Zoloft for his depression and anxiety and explained that his medications greatly improve his mental health symptoms. (Tr. 44–45, PAGEID #: 80–81). He further testified that he has never seen a counselor or sought any other kind of treatment for his depression or anxiety. (Tr. 45, PAGEID #: 81). The ALJ asked Plaintiff when his symptoms began and how his depression and anxiety impact his day-to-day life. Plaintiff responded as follows:

> A. I'd say a couple years ago. And it just gives you a bad outlook on life when you don't need to be. I got it made. I got a nice house. It's paid for. Got everything in the world to live for. Got a beautiful grandchild. Two nice kids. And what - - what's there - - why be hating life you know. So you're in a little bit of pain but you know.
> Q. And you said that the Zoloft kind of helps - -
> A. Yeah, it does.
> Q. - - you function better?
> A. Yeah. I'm going to see if he won't raise it up a little when I go back.

(Tr. 46, PAGEID #: 82).

When asked about his hobbies and outside activities, Plaintiff stated that he still does a little woodworking and exercises when he remembers. (Tr. 47, PAGEID #: 83). He explained that his granddaughter likes to walk and that he tries to take walks with her. (Tr. 48, PAGEID #: 84). He also goes grocery shopping and helps his mom with household duties to the extent he is able. (Tr. 46–48, PAGEID #: 82–84).

Plaintiff's counsel asked Plaintiff to discuss his attention span and concentration. (Tr. 53,

PAGEID #: 89). Plaintiff stated that his attention span is not what it used to be and that it sometimes takes him several attempts to understand an article. (*Id.*). When his counsel asked him whether he had difficulty interacting with other people or being around groups of people, Plaintiff testified that he gets "very nervous" around others. (*Id.*). He testified that, for example, he once had to leave a store because he "[c]ouldn't handle" the amount of people there. (Tr. 54, PAGEID #: 90). Plaintiff also testified that while his anxiety attacks have improved, he still experiences anxiety attacks "[a]t least three times a month." (*Id.*).

The ALJ then asked Plaintiff about his anxiety:

> Q. . . . So your anxiety upon questioning from Counsel you stated that you have problems - - you get nervous around others. Sometimes you have some panic attacks related to being around people.
> A. Yeah.
> Q. So it had - - I had noticed from your record that it seemed that most of the anxiety, at least the anxiety the doctor noted was primarily seemed to be a result of anxiety coming from the shortness of breath. Like you're short of breath and that leads to kind of like oh my God, I'm short of breath. I'm having some sort of - - like I have some - -
> A. Right.
> Q. - - panic anxiety going on with that which totally makes sense to me. That's totally normal. But outside of that you're having other anxiety too?
> A. I reckon, yeah, because that day I - - I didn't feel shortness of breath at all.
> Q. Have you talked to - -
> A. Mick - -
> Q. Dr. Mick about that?
> A. No, I go Friday.
> Q. Okay But you said it's been going on for - -
> A. And I will - -
> Q. - - long? Said it's been going on for months though, right?
> A. A couple months this here but - -
> Q. Okay.
> A. - - before, like you said, that been going on for a while, the breathing thing. And that's the first time I'd ever had to leave the store.

(Tr. 57–58, PAGEID #: 93–94).

The ALJ also asked Plaintiff's counsel about Raymond Mick's opinion regarding Plaintiff's mental health:

> ALJ: Let me ask you, if I could, while I got you here, so we have Mr. Mick, who's

> a Certified Nurse Practitioner?
> Atty: Yes, sir.
> ALJ: Do we have a diagnosis of any mental impairment in the record from a recognized medical source from SSA's perspective?
> Atty: Yeah, Dr. McDonough. It has listed as - - as a diagnosis.
> ALJ: I'm sorry. Dr. McDonough? Is that who we're talking about
>                    \*       \*      \*
> ALJ: Seems like Mick, CMP was the only one that I saw
> Atty: It has a CMP. He's trained. Has the education to be able to [INAUDIBLE] under 06-3P. Certainly, he's entitled to an evaluation of his opinion.
> ALJ: Absolutely.
>                    \*       \*      \*
> Atty: I mean I get that he's not acceptable treating source because if he's a CMP.
> ALJ: But we have to establish an impairment first though, right.
> ATTY: But certainly he's prescribed medications for the conditions as it listed consistently within his records as a diagnosis per his records.

(Tr. 68–70, PAGEID #: 104–06).

Finally, during the hearing, a vocational expert ("VE") opined that Plaintiff could perform the unskilled and light positions of marker, housekeeping cleaner, and labeler. (Tr. 61–62, PAGEID #: 97–98). The VE also opined that Plaintiff could perform the unskilled and sedentary positions of addresser, inspector, and polisher. (Tr. 64, PAGEID #: 100).

### B. Relevant Medical Evidence

Plaintiff's arguments concern his mental impairments only, and the Court consequently examines the relevant medical evidence pertaining to the same.

The record documents Plaintiff's symptoms of anxiety, mood swings, panic attacks, and shortness of breath. (*See, e.g.*, Tr. 242, PAGEID #: 278 (noting Plaintiff's "negative and hateful attitude"), Tr. 371, PAGEID #: 408 (reporting Plaintiff's symptoms as "loss of interest, depressed mood, fatigue, irritability, and anxiety"), Tr. 372, PAGEID #: 409 (noting presence of anxiety and panic attacks with shortness of breath, but also documenting mood swings as "not present")). Nurse Practitioner Mr. Mick began treating Plaintiff for his mood disorder in 2011. (Tr. 357, PAGEID #: 393). Records show that Mr. Mick listed one of Plaintiff's diagnoses as "mood disorder." (Tr. 368, PAGEID #: 404).

In March 2012, Plaintiff was seen for a number of physical issues but had a good mood and was oriented. (Tr. 327, PAGEID #: 363). In May 2012, he indicated that he had not consumed alcohol in three months. (Tr. 322, PAGEID #: 358). In August 2012, Plaintiff reported he was nervous for a job interview and experiencing stress from his inability to pay his bills. (Tr. 314, PAGEID #: 350). On January 3, 2013, Plaintiff saw Melissa Gargasz, D.O. for abdominal pain, explaining that he drank more than a pint of whiskey and vomited almost daily. (Tr. 215, PAGEID #: 251). Plaintiff stated that he was "trying to cut back to eventually quit drinking alcohol . . . I can't afford rehab." (*Id*.). After performing a physical examination, Dr. Gargasz documented Plaintiff's normal affect, normal thought content/perception, and appropriate insight. (Tr. 216, PAGEID #: 252). In February 2013, Plaintiff reported drinking "fairly heavily" heavily up to four to five months prior but had been without alcohol for the past two months. (Tr. 300, PAGEID #: 336). In October 2013, physical exam records note that Plaintiff was alert and oriented and had a good mood. (Tr. 286, PAGEID #: 322).

On April 9, 2014, Plaintiff saw Mr. Mick for a variety of physical issues. (Tr. 206, PAGEID #: 242). Mr. Mick noted Plaintiff's anxiety and panic attacks, but further noted that Plaintiff did not have mood changes and had normal memory, affect, thought content, perception, judgment, and insight. (Tr. 207, PAGEID #: 243). A July 2014 physical exam revealed that Plaintiff had a good mood and was alert and oriented. (Tr. 271, PAGEID #: 307). In August 2014, Plaintiff presented for an examination following an abnormal CT scan. (Tr. 419, PAGEID #: 455). While most of those notes concern Plaintiff's physical issues, they also show that Plaintiff's mental evaluation indicated "no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation and attention span," and "normal attention span and ability to concentrate." (Tr. 421, PAGEID #: 457). December 2014 records indicate that Plaintiff had a good mood, was alert and oriented, and was helping to care for his mother. (Tr. 262, PAGEID #: 298).Records from 2016 consistently note Plaintiff's normal affect, thought content, perception, judgment, and insight. For example, on January 16, 2016, Plaintiff presented to Mr. Mick with

complaints of decreased hearing. (Tr. 381, PAGEID #: 417). Mr. Mick reported that Plaintiff engaged in "heavy" alcohol us but that his affect and "thought content/perception" were normal and that his insight was "appropriate concerning matters relevant to self." (Tr. 381–82, PAGEID #: 417–18). In February 2016, Plaintiff reported that he had not consumed alcohol in two weeks but was smoking more cigarettes due to increased stress. (Tr. 347, PAGEID #: 383). On May 20, 2016, Mr. Mick noted that "Plaintiff feels he has poor social skills and interacts poorly with others," is "more comfortable" staying at home, and has never seen a psychiatrist. (Tr. 378, PAGEID #: 414).

On June 5, 2016, Mr. Mick completed a social security "medical source statement" form concerning Plaintiff's ability to perform work-related activities. (Tr. 350–52, PAGEID #: 386–88). On the form, Mr. Mick opined that Plaintiff was moderately to markedly limited in social interaction; mildly to moderately limited in sustained concentration and persistence with a marked limitation in ability to perform at production levels expected by most employees; and moderately limited in some areas of adaptation. (*Id*.). He also opined that Plaintiff was likely to be absent from work at least five days per month. (Tr. 352, PAGEID #: 388). Mr. Mick concluded that Plaintiff's "mood disorder" prevented him from tolerating ongoing stress. (*Id*.).

On June 20, 2016, Mr. Mick noted Plaintiff's depressed mood but reported "good tolerance of treatment." (Tr. 375, PAGEID #: 411). On August 15, 2016, Mr. Mick wrote to Plaintiff's attorney, explaining that Plaintiff's mood disorder "[m]ay result from excessive alcohol intake," but that "it may also be present prior to and result in excessive alcohol use." (Tr. 357, PAGEID #: 393). In the letter, Mr. Mick stated that Plaintiff "continues to drink more than 4 drinks per day, so it is not possible to determine whether this condition improves in the absence of alcohol use." (*Id*.). On August 18, 2016, Plaintiff presented to Mr. Mick for a follow-up appointment concerning his depression. (Tr. 372, PAGEID #: 408). Mr. Mick reported Plaintiff's symptoms as "loss of interest, depressed mood, fatigue, irritability and anxiety." (*Id*.). Mr. Mick's notes also indicate that Plaintiff tolerated treatment well and that Plaintiff stated he had been without alcohol for

eleven days, with "increased 'shaking.'" (*Id.*). Mr. Mick further noted that "patient reports mood generally pretty good most of the time." (Tr. 374, PAGEID #: 410).

On November 21, 2016, Plaintiff, in addition to complaining of physical issues, told Mr. Mick that he had anxiety and panic attacks when he was short of breath but that he had no mood changes. (Tr. 370, PAGEID #: 406). Mr. Mick listed a diagnosis of mood disorder with the "[i]mpression" that Plaintiff "reports mood generally pretty good most of the time." (Tr. 371, PAGEID #: 407). Mr. Mick further opined that Plaintiff's "abilities to perform any type of work is significantly limited by a combination of physical and psychiatric issues." (*Id.*). **The ALJ's Decision**

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2017 and had not engaged in substantial gainful activity since his alleged disability onset date of February 6, 2012. (Tr. 12, PAGEID #: 48). The ALJ determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine and chronic obstructive pulmonary disease. (*Id.*). Additionally, the ALJ determined that Plaintiff suffered from non-severe impairments, including hypertension, impaired hearing, and mood disorder. (Tr. 13–14, PAGEID #: 49–50). The ALJ found, however, that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 14, PAGEID #: 50). As to Plaintiff's RFC, the ALJ opined:

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except he can occasionally climb ramps and stairs and occasionally balance, stoop, kneel, crouch, and crawl but never climb ladders, ropes, or scaffolds. He can only occasionally be exposed to dust, odors, fumes, or pulmonary irritants. He must avoid unprotected heights, moving mechanical parts, and operation of a commercial vehicle.

(Tr. 15, PAGEID #: 51).

In discussing Plaintiff's mental health, the ALJ referred to Dr. Gargasz's reports of Plaintiff's mood swings and alcohol use. (Tr. 13, PAGEID #: 49). The ALJ also discussed Mr.

Mick's opinion regarding Plaintiff's mental health:

> . . . [Mr. Mick] . . . noted mood swing or mood disorder and indicated that the diagnosis of mood disorder had been established with his partner in 2011. As Mr. Mick is not an acceptable medical source to establish a diagnosis of a medically determinable impairment, it is unclear from the record whether an acceptable medical source actually diagnosed a medically determinable mental impairment of at least a year in duration. Additionally, there is no documentation of treatment from a professional mental health source, though the claimant has been prescribed psychotropic medication. Regardless of whether a medically determinable mental impairment is established, consistent with the following evidence, I find that a severe mental condition is not documented in the record, as there is no evidence of a condition that causes more than a minimal limitation in the claimant's ability to perform basic mental work activities.

(*Id*.) (internal citations omitted).

In reviewing the records, the ALJ concluded that while Plaintiff reported mental health issues, "his mental status functioning was routinely normal and did not appear to impede his activities of living, which were restricted by physical complaints rather than mental ones." (*Id*.). The ALJ elaborated on this finding:

> Specifically, in June 2016, he reported that he watched television and did word searches. At the hearing, he testified that he lived with his mother in a one-story house, drove a couple of times a month, did household chores slowly for short five-minute periods, grocery shopped, and walked with his granddaughter. . . . [t]reatment notes routinely documented that he was alert and oriented with no memory deficits, and that he had a good mood. The same treatment notes did not document any difficulty regarding his interactions with treatment sources despite his numerous appointments. The summarized evidence supports a finding of, a most, "mild" limitations to the functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. I note that this conclusion is substantially consistent with the finding of Ohio Division of Disability Determination (DDD) reviewing psychologists Juliette Savitscus, Ph.D., and Judith Schwartzman, Psy.D., who found insufficient evidence of a medically determinable mental impairment.

(Tr. 13–14, PAGEID #: 49–50) (internal citations omitted).

After determining that Plaintiff's mood disorder was not severe, and after detailing Plaintiff's medical records—including Mr. Mick's records regarding Plaintiff's mental health—

the ALJ turned to the opinion evidence. Relevant here, the ALJ summarized Mr. Mick's findings as follows:

> In June 2016, certified nurse practitioner Raymond Mick opined that the claimant had several moderate and marked mental work-related limitations due to a mood disorder. Mr. Mick also opined that the claimant had extreme exertional, postural, and manipulative limitations, and would likely have five or more days per month of partial or full day unscheduled absences. In August 2016, Mr. Mick opined that the claimant's back pain was not likely related to his continued alcohol use and acknowledged that the claimant's mood disorder might result from excessive alcohol, though it might also have been present prior to excessive alcohol use.

(Tr. 18–19, PAGEID #: 54–55). The ALJ then noted that Mr. Mick did not constitute an acceptable medical source:

> A nurse practitioner's opinion is not included among the acceptable sources of medical evidence defined in the regulations. For that reason, information provided by a nurse practitioner, such as Mr. Mick, does not equal in probative value reports from those sources shown as being acceptable such as licensed physicians and osteopaths.

(Tr. 19, PAGEID #: 55). He went on to explain that "there is no indication that Mr. Mick has any particular expertise in the field of mental health diagnosis and evaluation. (*Id*.). He further found Mr. Mick's "opinions regarding the claimant's marked physical and mental limitations [ ] inconsistent with his own treatment notes, which, as summarized, routinely document that the claimant was in no acute distress, had a good mood, and exhibited no difficulty interacting with medical personnel." (*Id*.). Accordingly, the ALJ gave Mr. Mick's opinion "little weight." (*Id*.).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health &*
*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also
be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To
this end, the Court must "take into account whatever in the record fairly detracts from [the] weight"
of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL
4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.    DISCUSSION

Although Plaintiff sets forth just one error, his asserted error is actually twofold. First,
Plaintiff alleges that, in coming to his conclusion, the ALJ "improperly discredited the findings of
treating nurse practitioner, Mr. Mick, despite [his] opinions being uncontradicted within the
record." (Doc. 11 at 6). Further, Plaintiff contends that the ALJ incorrectly classified his mood
disorder as a non-severe impairment. (*See generally id*.). The Court will address each argument
in turn.

### A.  Assessment of Raymond Mick's Opinion

The Court turns first to Plaintiff's argument that the ALJ improperly discredited the
opinions of certified nurse practitioner Mr. Mick. Specifically, Plaintiff contends that the ALJ
should have assigned greater weight to Mr. Mick's limitations regarding Plaintiff's ability to
respond appropriately to criticism, relate to the general public, complete work tasks in a normal
work day or week, perform at expected production levels, behave predictably, and tolerate
customary work pressures. (Doc. 11 at 6–7). Plaintiff states that the ALJ "erred by discrediting
Mr. Mick's opinions simply because he was not an acceptable medical source." (*Id*. at 7). Plaintiff
also contends that "the ALJ's allegation that Mr. Mick's opinions were less probative simply
because he was not an acceptable medical source is inconsistent with Agency rules" and "relie[s]

on an incorrect legal standard." (*Id.*). The Court, respectfully, finds these allegations to be a mischaracterization of the ALJ's analysis and ultimate conclusion.

To start, the ALJ did not rely on an incorrect legal standard. As a nurse practitioner, Mr. Mick is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead he is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function. *Id.* at *2. The ruling notes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists." *Id.* at *3. Such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* at *4. Accordingly, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id.* at *4–5. Also relevant is whether the source has a specialty or area of expertise related to a claimant's impairment. *McConnal v. Comm'r*, No. 1:14-CV-179, 2015 WL 350586, at *9 (S.D. Ohio Jan. 26, 2015), *report and recommendation adopted*, No. 1:14-CV-179, 2015 WL 728336 (S.D. Ohio Feb. 19, 2015) (citing regulations). Finally, the ruling states that

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939 at *6.

Plaintiff asserts that the ALJ "erred by discrediting Mr. Mick's opinions simply because he was not an acceptable medical source" and that "Mr. Mick's opinions could be entitled to greater weight than even the treating source." (Doc. 11 at 7). Plaintiff is correct that the ALJ found that Mr. Mick was not an acceptable medical source and, consequently, that his opinion "di[d] not equal in probative value reports from those sources shown as being acceptable such as licensed physicians and osteopaths." (Tr. 19, PAGEID #: 55). What Plaintiff largely omits from his statement of errors, however, is that the ALJ went on to provide numerous other reasons supporting his assignment of "little weight" to Mr. Mick's opinion. As such, the ALJ did not, as Plaintiff asserts, follow an improper legal standard by cursorily dismissing Mr. Mick's opinion simply because he is a nurse practitioner. *See, e.g.*, *Antonaros-Ewing v. Comm'r*, No. 3:14-CV-13, 2015 WL 5047968, at *5 (S.D. Ohio Feb. 17, 2015) ("Such detailed and reasoned explanation shows that, contrary to [p]laintiff's contention, the ALJ did not discount [the nurse practitioner's opinions] solely because she is not an 'acceptable medical source.' Instead, the ALJ appropriately recognized that—as an 'other source—[the nurse practitioner's] opinions are not entitled to 'special deference' under the regulations (in comparison to, for example, a treating physician)."). This is not, therefore, a case where the ALJ completely failed to consider the nurse practitioner's opinion. *See, e.g.*, *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007). In *Cruse*, the Sixth Circuit found that the ALJ failed to provide "any degree of specific consideration of the [nurse practitioner's] functional assessments." *Id*. at 541. Instead, the "ALJ's *only* explanation for discounting [the nurse practitioner's] opinion was that '[the nurse practitioner] is neither a medical

doctor nor a vocational expert, and thus lacks the credentials for making such a determination.'" *Id*. at 541 (emphasis added). Put simply, the ALJ in *Cruse* "did not give the opinion significant weight *or* explain his reasons for discounting [it]." *Id.* (emphasis added).

Here, in contrast, the ALJ considered and ultimately rejected Mr. Mick's opinion for record-based reasons, which is consistent with his obligation under the regulations. First, the ALJ noted that Mr. Mick was not a mental health specialist and that "there was no indication that Mr. Mick has any particular expertise in the field of mental health diagnosis and evaluation." (Tr. 19, PAGEID #: 55). Whether an "other source" has a relevant specialty is a proper consideration under the regulations. *See McConnal*, 2015 WL 350586, at *9 (noting, as relevant under the regulations, whether the source has a specialty or area of expertise related to plaintiff's impairment). Further, the ALJ found that Mr. Mick's opinions regarding Plaintiff's physical and mental limitations were "inconsistent with [Mr. Mick's] own treatment notes, which, as summarized, routinely document that the claimant was in no acute distress, had a good mood, and exhibited no difficulty interacting with medical personnel." (Tr. 19, PAGEID #: 55). This too is a proper consideration under the regulations. *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939 at *4–5 (whether other source's opinion is consistent with other evidence is relevant to evaluation of source's opinion). Finally, the ALJ assigned Mr. Mick's opinion little weight because he found the basis of Mr. Mick's diagnosis of mood disorder to be unclear. (Tr. 19, PAGEID #: 55). As noted by the ALJ, Mr. Mick "acknowledged" that Plaintiff's mood disorder "might result from excessive alcohol," but also acknowledged it was possibly "present prior to excessive alcohol use." (*Id*.). The basis for a source's opinion is also a relevant consideration. *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939 at *4–5 (noting that how well the source explains an opinion is relevant to evaluation of that source's opinion). Accordingly,

the ALJ properly considered three of the four factors relevant to weighing a non-medical source's opinion. His analysis was therefore sufficient to support his assignment of "little weight" to Dr. Mick's opinion. *See, e.g.*, *Antonaros-Ewing*, at \*5 (finding that the ALJ "properly considered" nurse practitioner's "lack of specialization as a mental health provider" and the "inconsistency of her opinion" with other record evidence).

Perhaps Plaintiff's strongest argument is that the ALJ should have given Mr. Mick's opinion greater weight, considering the length of time Mr. Mick treated Plaintiff. As noted *supra*, the length of time the source has known the claimant is a relevant factor to a court's analysis of a non-medical source's opinion. *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939 at \* 4–5. But, as established above, the ALJ found three of the four factors—consistency with the record, quality of the source's explanation of Plaintiff's mood disorder, and the source's expertise or specialization—to be lacking. While the ALJ could have expressly noted the length of time Mr. Mick treated Plaintiff, he was not required to do so. Indeed, all that is required is that the ALJ "explain the weight" assigned to "other sources," or "otherwise ensure that the discussion of the evidence . . . allows . . . a reviewer to follow the adjudicator's reasoning[.]" SSR 06-03P, 2006 WL 2329939 at \*6. Here, the ALJ's discussion regarding his evaluation of Mr. Mick's opinion satisfies this standard. *See, e.g.*, *Antonaros-Ewing*, 2015 WL 5047968, at \*5 (finding that the ALJ provided a "detailed and reasoned explanation," which showed that "contrary to [p]laintiff's contention, the ALJ did not discount [the nurse practitioner's] opinions solely because she is not an 'acceptable medical source,'" but instead "appropriately recognized that—as an 'other source— [the nurse practitioner's] opinions are not entitled to 'special deference' under the regulations . . . and proceeded to appropriately weigh her opinions utilizing the (regulations) factors.").

Plaintiff also emphasizes that the record contains no other opinion regarding his mental health, and, as such, the ALJ should have assigned greater weight to Mr. Mick's opinion. (Doc. 11 at 8). This argument fails. As the ALJ notes, the record did not indicate that Mr. Mick was a mental health specialist, and there was "no documentation of treatment from a professional mental health source[.]" (Tr. 13, PAGEID #: 49). Moreover, as acknowledged by Mr. Mick himself, the basis of Plaintiff's mood disorder is unclear. (Tr. 19, PAGEID #: 55). Further, the ALJ found Mr. Mick's opinions both internally inconsistent and inconsistent with the medical evidence as a whole. (Tr. 13, 19, PAGEID #: 49, 55). While Plaintiff is correct that Mr. Mick provides the only opinion regarding Plaintiff's mental health, the ALJ's opinion demonstrates that numerous aspects of Mr. Mick's opinion fall short. The fact that Mr. Mick provides the sole opinion regarding Plaintiff's mental health does not, in turn, amount to a requirement that the ALJ assign that opinion more weight.

In sum, the Court finds that the ALJ, consistent with his obligation under the regulations, provided a sufficient explanation for his decision to assign Mr. Mick's opinion little weight. Accordingly, the ALJ did not commit reversible error.

### B. Assessment of Plaintiff's Mood Disorder

Turning next to the ALJ's classification of Plaintiff's mood disorder, the Court finds that substantial evidence supports the ALJ's conclusion. On this point, Plaintiff contends that the ALJ "incorrectly classified [his] mood disorder as a non-severe impairment" and that the ALJ erred in finding that Plaintiff's mental condition caused no more than "mild" limitations. (Doc. 11 at 6).

A claimant "bears the burden of demonstrating that he suffers from a medically determinable physical impairment" as well as "the burden of showing a severe impairment by medical evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 559 (6th Cir. 2014); *Watters*

*v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 421 (6th Cir. 2013). The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal quotation marks and citation omitted), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." *See* Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996). Because the regulations require an ALJ to consider both severe and non-severe impairments in the remaining steps of the disability determination analysis, once a severe impairment is found, all impairments, regardless of how they are classified, will be analyzed in the ALJ's determination. *See Dyer v. Colvin*, No. CV-14-156-DLB, 2016 WL 1077906, at *3 (E.D. Ky. Mar. 17, 2016). "For this reason, the Sixth Circuit has consistently held that an ALJ does not commit reversible error when he or she decides that some of claimant's impairments are not severe, but finds that other impairments are severe and proceeds with his or her analysis." *Id.*

In this case, the issue is not whether this Court would come out differently on the severity determination, but whether substantial evidence supports the ALJ's finding. *See Reed v. Colvin*, No. CIV. 13-54-GFVT, 2014 WL 318569, at *3 (E.D. Ky. Jan. 29, 2014) ("The limited nature of substantial evidence review prevents the reviewing court from substituting its judgment for that of the ALJ."). Here, the Court finds that substantial evidence supports the ALJ's classification of Plaintiff's mood disorder as non-severe.

As a starting point, the ALJ could not, based on the record before him, determine whether Plaintiff's mood disorder constituted a medically determinable impairment. The basis for a diagnosis is important because a medically determinable impairment cannot be found on the basis of an individual's statements alone; rather, there needs to be "medical signs or laboratory

findings." SSR 16-3p; SSR 96-4p (rescinded effective June 14, 2018, after the ALJ's decision). Mr. Mick, as an "other source," cannot establish the existence of a medically determinable impairment. *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939. And, as noted by the ALJ, it was "unclear from the record whether an acceptable medical source actually diagnosed a medically determinable mental impairment of at least a year in duration." (Tr. 13, PAGEID #: 49). Consequently, the ALJ was unsure whether Plaintiff's mood condition even constituted a medically determinable impairment, let alone a severe one. (*Id.*).

Regardless, the ALJ went on to discuss whether he found Plaintiff's mood disorder to be severe. (*Id.*). In support of his finding that Plaintiff's mood disorder was not severe, the ALJ noted that there was "no documentation of treatment from a professional mental health source, although the claimant has been prescribed psychotropic medication." (*Id.*). He also noted that his finding regarding Plaintiff's mood disorder was consistent with the opinions of the State reviewing psychologists, who found insufficient evidence of a medically determinable mental impairment. (Tr. 13–14, PAGEID #: 49–50). In further support of his finding, the ALJ detailed relevant evidence from the record and the hearing testimony:

> Although the claimant reported mental symptomatology, his mental status functioning was routinely normal and did not appear to impede his activities of living, which were restricted by physical complaints rather than mental ones. Specifically, in June 2016, he reported that he watched television and did word searches. At the hearing, he testified that he lived with his mother in a one-story house, drove a couple of times a month, did household chores slowly for short five-minute periods, grocery shopped, and walked with his granddaughter. He said that he arose at 4:30 a.m., drank a cup of coffee, drank another cup at 6:00 a.m. got out of his chair around 10:00 a.m., checked on his mother, showered, ate cereal, cleaned laundry, ate supper, and otherwise sat around. He said that he enjoyed magazines but might have to reread them. As summarized in Finding 5 below, treatment notes routinely documented that he was alert and oriented with no memory deficits, and that he had a good mood. The same treatment notes did not document any difficulty regarding his interactions with treatment sources despite his numerous appointments.

(Tr. 13–14, PAGEID #: 49–50).

Plaintiff relies on Mr. Mick's notes documenting his anxiety and panic attacks. (Doc. 11 at 7). Specifically, Plaintiff cites Mr. Mick's notes reporting a loss of interest, depressed mood, fatigue, irritability, and anxiety. (*Id.*) He also emphasizes Mr. Mick's opinion that Plaintiff's mood disorder prevented him from tolerating repeated and ongoing stress. (*Id.* at 7–8). What Plaintiff seems to overlook is that in reaching his decision, the ALJ devoted a substantial part of his analysis to a thorough review of Plaintiff's mental health records—including the very records that Plaintiff cites in support of his severity argument. For example, the ALJ acknowledged that in 2016, Mr. Mick opined that Plaintiff had "several moderate and marked mental work-related limitations due to a mood disorder." (Tr. 18, PAGEID #: 54). The ALJ also discussed Mr. Mick's opinion that Plaintiff "would likely have five or more days per month of partial or full day unscheduled absences." (Tr. 19, PAGEID #: 55). Moreover, the ALJ, in his discussion of Plaintiff's medical records, noted that "[i]n August 2016, [Plaintiff] reported loss of interest, depressed mood, fatigue, irritability, and anxiety with an onset of one month prior." (Tr. 18, PAGEID #: 54). Based on his assessment of the record as a whole, the ALJ reached the following conclusion regarding Plaintiff's mood disorder:

> The summarized evidence supports a finding of, at most "mild" limitations to the functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. I note that this conclusion is substantially consistent with the finding of Ohio Division of Disability Determination (DDD) reviewing psychologists . . . who found insufficient evidence of a medically determinable mental impairment.

(Tr. 14, PAGEID #: 50).

At bottom, Plaintiff argues that the ALJ erred in his assessment of the medical evidence because the ALJ reached a conclusion that differs from Plaintiff's view of the evidence. This is

not grounds for reversal. "The ALJ is not bound to accept evidence that is contradictory to, or unsupported by the evidence of record. When there are contradictory opinions in the record, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner." *Jones v. Soc. Sec. Admin.*, No. CIV. 3:13-1204, 2015 WL 1235039, at *10 (M.D. Tenn. Mar. 17, 2015) (citing 20 C.F.R. § 416.927(e)(2)).

Further, the Court has reviewed the record and finds that substantial evidence supports the ALJ's characterization of Plaintiff's mood disorder as non-severe. While a substantial portion of the medical record relates primarily to Plaintiff's physical conditions, the record contains numerous benign and normal findings concerning Plaintiff's mental health. (*See, e.g*, Tr. 327, PAGEID #: 363 ("On examination today, [Plaintiff] is alert. He is oriented. Mood was good."); Tr. 314, PAGEID #: 350 (noting that Plaintiff was alert, oriented, and able to follow commands); Tr. 286, PAGEID #: 322 (noting that Plaintiff was alert, oriented, and had a good mood), Tr. 270, PAGEID #: 307 (same); Tr. 206–07, PAGEID #: 342–43 (Mr. Mick's notes documenting that Plaintiff had normal memory, affect, thought content, perception, judgment, and insight); Tr. 376, PAGEID #: 412 (Mr. Mick's reports that mood changes were "[n]ot present," that Plaintiff was alert and oriented with no impairment of recent or remote memory, and that his affect and thought content/perception were both normal); Tr. 379, PAGEID #: 415 (Mr. Mick's notes that Plaintiff has anxiety and panic attacks with shortness of breath but that mood changes were not present), Tr. 385, PAGEID #: 421 (same); Tr. 382, PAGEID #: 418 (Mr. Mick's findings that Plaintiff was alert and oriented with no impairment of recent or remote memory and normal coordination and that Plaintiff's affect and thought content/perception were both normal); Tr. 421, PAGEID #: 457 ("[M]ental status exam performed with findings of no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation and attention span and ability to concentrate are

normal."); Tr. 262, PAGEID #: 298 (noting that Plaintiff had been helping care for his mother, that he was alert and oriented, and that his mood was good)).

It is true that the record contains evidence of Plaintiff's anxiety and mood issues, which could arguably support a different finding. However, what is important here is that the ALJ did not overlook this evidence. Indeed, the ALJ properly assessed the medical record as a whole—including the evidence Plaintiff cites regarding his mental health—and reached a conclusion that is supported by substantial evidence. "If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings." *Geel v. Astrue*, No. 2:12-CV-377, 2013 WL 3975699, at *9 (E.D. Tenn. July 29, 2013) (citing *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996)). "The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner . . ." *Id.* Rather, "[t]he substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the court." *Id.* (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)). Here, the record contains substantial evidence to support the ALJ's finding that Plaintiff's mood disorder was not severe.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting

authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: October 26, 2018
/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE